BROAD STREET BANK v. THE NATIONAL BANK OF GOLDSBORO.

(Filed 10 May, 1922.)

1. **Banks and Banking—Checks—Indorsement—Fraud—Indebitatus Assumpsit—Statutes.**

   Where the maker of a check, whether a bank·or other corporation, or an individual, fills out the blank spaces by writing in ink and delivers it to the payee as a complete instrument, there is no question of implied agency of the payee to do anything further regarding the negotiation of the instrument as the agent for the maker, and where the payee has fraudulently raised the amount of the, check, endorses to another, and receives the money thereon, the maker is not liable to the endorsee except in an action for the original or true amount of the check, upon equitable principles, and allowed by our negotiable instrument law.   C. S., 3160.

2. **Same—Equity—Innocent Persons—Principal and Agent—Trusts.**

   The equitable principle that where one of two innocent persons must suffer, the law will cast the loss upon him who has put it in the power of another to do the injury,. ordinarily arises in instances of fraud or breaches of trust involved in the contract of agency, where one clothed with the real or apparent authority to act for another in the premises has in excess or breach of the authority given, acted to another's injury ; and not to instances wherein the maker of a check has filled in the blank places with ink, has signed the same and delivered it to the payee as a completed instrument, and the payee has raised the check to a larger amount, without the assent of the maker, and has fraudulently obtained cash thereon from another, by endorsement.

3. **Same — Negligence — Sensitized Paper— Erasures—Protectographs— Contracts—Tort.**

   Where completed checks issued by a bank upon its regular form of checks has been signed by its proper officer, raised by the payee, and endorsed to and cashed by another bank, which brings action against the maker bank for the full amount of the altered checks, the failure of the maker bank to use sensitized paper to prevent chemical erasures and a protectograph, with perforated figures, to prevent fraudulent alterations, is too remote to afford the basis of an action either in tort or contract, or to be considered the proximate cause of the injury, upon an issue of negligence ; and the plaintiff is confined to his action for the true amount for which the checks were originally made.   C. S., 3106.

4. **Same.**

   The equitable principle upon which the indorsee of a check which has been raised by the payee without the maker's assent, is only permitted to recover from the maker upon an *indebitatus assumpsit*, extends to banking institutions, to individual makers, or general business concerns.   C. S., 3106.

CLARK, C. J., dissenting.

APPEAL by plaintiff from *Cranmer, J.,* at August Term, 1921, of WAYNE.

Civil action, tried on demurrer to complaint. It appeared from the complaint that one N. L. Massey, a man of business affairs, living in Richmond, Va., well known there and indebted to some of its banks, the plaintiff among others, on or about 18 June, 1918, was in Goldsboro, N. C., and that "after regular banking hours, when Massey and Norwood were alone in the office of defendant, the latter, at the request of said Massey, issued to him four New York Exchange checks for the sums respectively of $2, $6, $2, and $3, payable to said Massey, and signed by G. A. Norwood as president of defendant bank. That they were written out for said amounts in ink, on the lithograph form and paper ordinarily used by the bank with its customers, all the blanks being filled, same were taken by said Massey, and later the ink was erased by chemicals and fraudulently filled out by him for increased amounts aggregating over $40,000, and negotiated with the plaintiff bank for value, or near it, some of the money procured being credited on plaintiff's indebtedness against Massey, and plaintiff sues to recover the amount paid out by them on account of the alleged negligence of defendant, in that its president, Norwood, in drawing said checks failed to use sensitized paper and protectograph devices for making alterations of said checks more difficult, whereby the payee using protectograph himself was enabled to impose said checks upon plaintiff for the larger amount. That the said allegations of negligence on which plaintiff seeks to establish liability of defendant are more especially set forth in the complaint as follows:

"11. That it is a matter of common and general knowledge, which was known, or should reasonably have been known, by defendant's officers and employees at the time of the issuance of said checks, that there had been discovered and developed certain simple chemical preparations which were easily procurable at retail stationery stores at small cost by the public generally, and were in general use for legitimate purposes, and some of which had been widely advertised in this and other states, by means of which a person of ordinary skill and learning, such as said Massey, could easily remove from an ordinary good grade of white bond or ledger paper, such as said checks were written upon, all traces of writing placed thereon with ordinary pen and ink, such as were used in filling in and signing said checks by said Norwood, defendant's president, leaving no visible sign or trace upon the paper of either the original writing or the removal thereof by the chemicals used in the process of such removal, and without injury to the surface or fiber of the paper; and that by the use of such generally known preparations and processes the figures and words denoting the amounts of said four checks, as and in the form originally issued by defendant, could be easily and readily removed and new words and figures written therein in such a way as to

escape detection by a reasonably prudent and careful person in the ordinary course of business, and in the manner in which said checks were altered and raised subsequent to their original issue. That said four checks were actually altered as hereinbefore stated by the aforesaid process.

"12. That several years prior to 1918 the danger of innocent parties being damaged and defrauded by application of the processes described in the foregoing paragraph, became a matter of common and general knowledge and grave concern to all business men, and especially to bankers, and in step with the orderly march of progress wherein science and advance learning are continually devising ways and means to combat the dangers arising from the use in modern times and conditions of archaic and inefficient methods, certain simple protective processes and devices were evolved and adopted, and were, in June, 1918, and had been for some years prior thereto, commonly known and approved and in common and general use by banking institutions and business houses in this and all other states, as plaintiff is informed and believes, by the use of which simple processes and devices checks could be so drawn that they could not, by the use of the processes set forth in paragraph eleven above, or any other process, be altered or raised so as to escape detection by a reasonably careful and prudent person in the ordinary course of business by any person save a very few especially trained and highly expert and experienced chemists and document experts, and especially could not have been so altered or raised by said Massey or any person of ordinary skill and knowledge, such protective processes and devices being as follows:

"(*a*) The drawing of checks upon a specially prepared type of paper, known as 'safety paper,' with specially treated and tinted surface, the properties of which are such that no erasure or alteration of the writing thereon can be made, by either chemical or mechanical processes, without leaving upon the surface and fibre of paper itself certain visible and ineradicable tell-tale traces and evidences of such erasures or alterations, except possibly by a very few especially trained and highly expert and experienced chemists and document experts.

"(*b*) The use of a device or machine of the general kind and type of those known as the 'protectograph' or the "protecto check writer,' or some mechanical device, whereby the letters forming the words denoting the amount of the check are punched, cut or perforated into the paper, as described in paragraphs three and nine above, and which write the check in such form as to render impossible its alteration by a person of ordinary skill and knowledge, such as Massey, and in such a way as to escape detection by an ordinary careful and prudent person in the ordinary course of business, and as to render highly improbable its alteration

in such a way even by a chemist or document expert of especial training and long experience. That the use of such devices and machines by banks had, in June, 1918, and for several years prior thereto, become so common and general, and the safety from alteration of checks prepared thereon had, during all said years, become so generally recognized by bankers and business men in this State and country that checks so drawn were at said times, and are now, everywhere accepted and taken without question as having been originally so issued and as being free from alteration, as plaintiff is informed and believes.

"13. That by its known, common, uniform and habitual use of a machine or device of the general type and kind described above in paragraphs three, nine, and twelve, in drawing and issuing checks upon its New York depositories, commonly known as New York Exchange checks, defendant, as plaintiff is informed and believes and alleges, led and persuaded the public and other banks in general, and this plaintiff in particular, to reasonably depend and rely upon the fact, and expect that all such checks drawn and issued by defendant would be drawn and filled in, as to the amount thereof, upon such machine or device, and to reasonably rely upon the apparent genuineness of such checks so drawn and bearing the genuine signature of defendant's duly authorized officer, and with no visible traces or evidence of alterations apparent thereon; that in accepting and negotiating said four checks issued by defendant, plaintiff did reasonably rely, and was led by defendant's said actions to rely, upon their apparent genuineness.

"14. That it is, and was at said times, a matter of common and general knowledge, well known to defendant, its agent and officers, that New York Exchange checks issued by banks in good standing and repute, such as defendant, to the order of known payee, and drawn with the use of the aforesaid safety devices, enjoyed a high degree of negotiability and were accepted and freely negotiated at their face value by banks and business men generally in the ordinary course of business, without particular investigation or question; that defendant well knew, and plaintiff alleges, that such checks drawn without the use of said protective devices and processes, but with ordinary pen and ink, in the manner in which said four checks in question were originally drawn and issued by defendant, and capable of being easily and readily altered and raised by persons of ordinary skill and knowledge, such as said Massey, in such a way as to escape detection, were a grave menace to banks and business men generally, and constituted dangerous instrumentalities capable of vicarious damage and injury; that it was defendant's duty to the general public and this plaintiff in particular, in issuing such checks, and particularly the said four checks, to use all means, devices, and processes generally known and approved, and in common and general use in bank-

ing institutions, and especially the means, devices, and processes which defendant habitually used, to the knowledge of plaintiff, to render such checks incapable of being so altered and raised without such alteration, being capable of detection by the exercise of ordinary care; and although defendant knew, or should reasonably have known and foreseen, that plaintiff or some other banking institution was liable to be injured and damaged thereby, it nevertheless carelessly, negligently, and in breach of its legal duty issued said four checks in the manner and form aforesaid, with no protective safeguards whatever against their alteration in the manner and way in which they were subsequently altered.

"15. That defendant and its officers and employees were negligent in that they drew and issued said four checks to N. L. Massey without the use of safety paper and the other protective devices above described, and in that they issued said checks in such form that they could be easily and readily altered and raised by a person of ordinary skill and knowledge, such as said Massey, in such a way as to escape detection, as stated above in detail; that such negligent acts and omissions were the proximate cause of plaintiff's acceptance and purchase of said checks for the amounts as altered and of plaintiff's loss, damage, and injury as hereinbefore and hereinafter alleged, and all of which loss, damage, and injury should reasonably have been foreseen by a reasonably prudent person in the banking business, and especially by defendant as the probable result of its negligent acts and omissions."

Defendant demurred on the ground chiefly "that it appears from the complaint that each of the paper-writings in controversy was a negotiable instrument, and the same was materially altered without the assent of the defendant, and plaintiff is not seeking to enforce payment thereof according to its original tenor."

There was judgment sustaining the demurrer, and plaintiff excepted and appealed.

*A. D. Christian and Clarkson, Taliaferro & Clarkson for plaintiff.*
*Teague & Dees and R. N. Simms for defendant.*

HOKE, J. It is the accepted position "that for the purpose of presenting the legal questions involved, a demurrer is construed as admitting relevant facts, well pleaded, and ordinarily relevant inferences of fact, readily deducible therefrom, but the principle does not extend to admitting conclusions or inferences of law," etc. *Board of Health v. Comrs.,* 173 N. C., 250-253, citing *Pritchard v. Comrs.,* 126 N. C., 908-913; *Hopper v. Covington,* 118 U. S., 148-151; *Equitable Assurance v. Brown,* 213 U. S., 25, and other cases.

While there are general averments of negligence and proximate cause imputing liability to the defendant bank, a perusal of the complaint

will disclose that in so far as they contain or purport to contain allegations of the pertinent facts, the plaintiff rests and intends to rest his right to recover on the basic proposition that the defendant issued to one N. L. Massey, as payee, four New York checks for small amounts, $2, $6, $2, and $3, payable to one N. L. Massey, without using therefor the sensitized or safety paper, and without using the protectograph, an implement whereby the letters showing the amount of the checks are punctured into the paper and otherwise protected from alteration, and for lack of which the said checks, without the knowledge of plaintiff or defendant, were raised by said Massey, payee, respectively to $9,018.12, $14,084.70, $9,000, and $12,903, and negotiated with or through plaintiff bank, receiving therefor from plaintiff at or near the amount called for in the raised or altered condition, and the suit is instituted to recover the amounts so paid from defendant.

In this connection, and with other averments, the complaint alleges further that these checks for the smaller amount were executed on the ordinary paper of the bank, with lithograph forms. The spaces are filled out by writing in ink, signed by the president of defendant bank, and delivered to the payee as completed instruments. And on these the controlling facts in the transaction, the great weight of well considered authority on the subject is against the liability which plaintiff now seeks to enforce. *National Exchange Bank v. William Lester,* 194 N. Y., 461; *Greenfield Savings Bank v. Stowell,* 123 Mass., 196; *Burrows v. Klunk,* 70 Md., 451; *Holmes v. Trumper,* 22 Mich., 427; *Knoxville Bank v. Clark,* 51 Iowa, 264; *Lanier v. Clark* (Texas Civil Appeals), 133 Southwestern, 1093; *Bank v. Wangerin,* 65 Kansas, 423; *Fordyce v. Kosminski,* 49 Arkansas, 40; *Goodman v. Eastman,* 4 N. H., 455; *Bothell v. Schweitzer,* 84 Nebraska, 271; *Walsh v. Hunt,* 120 Cal., 46; *Simmons v. Atkinson & Lampton,* 69 Miss., 862; *Exchange Bank v. Bank of Little Rock,* 58 Federal, 140; *Commercial Bank v. Arden,* 177 Ky., 520; 1st Randolph on Commercial Paper, sec. 187; 1 R. C. L., title Alteration of Instruments, secs. 69 and 70.

In the New York case just cited (*Bank of Albany v. Lester*), it was held: "Where negotiable paper has been executed with the amount blank, it is no defense against a *bona fide* holder for value for the maker to show that his authority has been exceeded in filling such blank, and a greater amount written than was intended. But if the instrument was complete without blanks at the time of its delivery, the fraudulent increase of the amount, by taking advantage of a space left without such intention, will constitute a material alteration. In the latter case, under section 205 of the Negotiable Instrument Law (C. S., 3106), payment thereof may be enforced according to its original tenor. Second, an indorser of a promissory note, the amount of which has been fraudu-

lently raised after indorsement by means of a forgery, is not liable upon the instrument in the hands of a *bona fide* holder for the increased amount, because of negligence in indorsing same when there were spaces thereon which rendered the forgery easy, though the note was complete in form. No liability on the part of the indorser for the amount of such a note as raised can be predicated simply upon the fact that such spaces existed thereon."

That was a case in which it was sought to hold the indorser liable, but *Judge Willard Bartlett,* delivering the opinion, refers with approval to a number of the leading cases in which it was sought to hold the maker liable and in which the proposition was rejected, and in closing the opinion makes comment on the general question of liability as follows: "On what theory is the indorser negligent because he places his name on paper without first seeing to it that these spaces are so occupied by cross lines or otherwise as to render forgery less feasible? It can only be on the theory that he is bound to assume that those to whom he delivers the paper or into whose hands it may come, will be likely to commit a crime if it is comparatively easy to do so. I deny that there is any such presumption in the law. It would be a stigma and a reflection upon the character of the mercantile community, and constitute an intolerable reproach of which they might well complain as without justification in practical experience or the conduct of business. That there are miscreants who will forge commercial paper by raising the amount originally stated in the instrument is too true, and is evidenced by the cases in the law reports to which we have had occasion to refer; but that such misconduct is the rule, or is so general as to justify the presumption that it is to be expected, and that business men must govern themselves accordingly, has never yet been asserted in this state, and I am not willing to sanction any such proposition, either directly or by implication. On the contrary, the presumption is that men will do right rather than wrong. As was said by *Judge Cullen,* in *Critten v. Chemical National Bank* (171 N. Y., 224), it is not the law that the drawer of a check is bound so to prepare it that nobody else can successfully tamper with it. Neither is it the law that the indorser of a promissory note, complete on its face, may be made liable for the consequences of a forgery thereof, simply because there were spaces thereon which rendered the forgery easier than would otherwise have been the case."

In *Savings Bank v. Stowell, supra,* the question as to the liability of one of the makers of a negotiable instrument fraudulently altered without his knowledge and after the delivery in complete form, was examined and dealt with in an elaborate opinion by *Chief Justice Gray,* and the conclusion reached, "That the alteration of a promissory note by one of several makers, not assented to by the others, and by which the amount

is increased by inserting words or figures .in a blank space left in the printed form on which it is written, avoids the note as to the other makers, even in the hands of a *bona fide* holder for value."

The same position was sustained by the Supreme Court of Michigan in *Holmes v. Trumper,* 22 Mich., 427, and in the able opinion of *Associate Justice Christancy* it is said, among other things: "The negligence, if such it can be called, is of the same kind as might be' claimed if any man, in signing a contract, were to place his name far enough below the instrument to permit another line to be written above his name in apparent harmony with the rest of the instrument. . . . Whenever a party in good faith signs a complete promissory note, however awkwardly drawn, he should, we think, be equally protected from its alteration by forgery in whatever mode it may be accomplished; and unless, perhaps, when it has been committed by some one in whom he has authorized others to place confidence as acting for him, he has quite as good a right to rest upon the presumption that it will not be criminally altered, as any person' has to take the paper on the presumption that it has not been; and the parties taking such paper must be considered as taking it upon their own risk, so far as the question of forgery is concerned, and as trusting to the character and credit of those from whom they receive it, and of the intermediate holders."

In *Bank v. Wangerin,* 65 Kansas, 423, *supra,* the correct position, in our view, is stated as follows: "Where a negotiable instrument is delivered to a payee, complete in all of its parts, the maker thereof is not liable thereon even to an innocent holder, after same has been fraudulently. altered so as to express a larger amount than was written therein at the time of its execution. Second, such maker is not bound at his peril to guard against the commission of forgery by one into whose hands such instrument may come."

And in Randolph on Commercial Paper the author states the position resulting from his examination of the authorities on the subject, as follows: "Where negotiable paper has been executed with the amount blank, it is no defense against a *bona fide* holder for value for the maker to show that his authority has been exceeded in filling such blank, and a greater amount written than was intended. This was also once held to be the rule where no blank had been actually left, but the maker had negligently left a space either before or after the written amount which made it easier for a holder fraudulently to enlarge the sum first written. It has now, however, become the established rule that, if the instrument was complete without blanks at the time of its delivery, the fraudulent increase of the amount by taking advantage of a space left without such intention, although it may be negligently, will constitute a material alteration, and operate to discharge the maker."

In citation to R. C. L., *supra,* the author says, in effect, that the cases holding that negligence on the part of the maker will preclude the defense suggested and set up in the demurrer, was based upon an old English case (*Young v. Grote,* 4 Bing., 253), which had been criticised and distinctly disapproved in principle by subsequent and authoritative English decisions, and that the weight of authority is now in accord with the latter position.

The rule of liability approved by these able and learned courts has been in effect adopted or approved in our Negotiable Instrument Act (C. S., 3106), which provides: "That where a negotiable instrument is materially altered without the assent of all parties liable thereon, it is avoided except as to a party who has himself made, authorized, or assented to the alteration, and subsequent indorsers. But where an instrument has been materially altered, and is in the hands of a holder in due course, not a party to the alteration, he may enforce payment according to the original tenor." It will be noted that the closing paragraph of this section extends to the holder in due course the right to recover the amount received by the maker on the instrument as originally drawn, and enlarging the holder's rights to that extent on the equitable principles which prevail, and sustain the action of *indebitatus assumpsit.* But the former portions of the section are in clear recognition of the principle that a completed instrument fraudulently altered after delivery or materially altered without his assent, will not sustain a recovery against the maker. The significance of this legislation is well brought out in the Kentucky case, above cited, of *Commercial Bank v. Arden,* 177 Ky., 520. In that case the Court held that the maker of a completed negotiable instrument could not be held liable for the raised value of the paper altered after delivery, without his consent or knowledge. And in referring to some of the previous decisions of the Kentucky Court, apparently to the contrary, *Hurt, J.,* delivering the opinion, after an intimation that some of those cases might be distinguished on the ground of an implied authority to make the alteration, said that the question was now controlled by the Negotiable Instrument Act, avoiding a completed instrument by material alteration after delivery.

It is earnestly urged for the appellant that this claim should be upheld in proper application of the equitable principle that where one of two equally innocent persons must suffer, the law will cast the loss upon him who has put it in the power of another to do the injury. But the cases calling for the application of the principle, so far as examined, were instances of fraud or breaches of trust involved in the contract of agency, where one clothed with the real or apparent authority to act for another in the premises has in excess or breach of the authority given acted to another's injury. These were the instances cited, and much relied upon

by appellant, from our own Court, *R. R. v. Kitchin,* 91 N. C., 29; *Humphreys v. Finch,* 97 N. C., 303; *Rollins v. Ebbs,* 138 N. C., 140; *Bank v. Dew,* 175 N. C., 79.

In the first three of these cases defendant had clothed another with apparent authority to do the act by which the injury was wrought, and the last, defendant Dew, by gross negligence, had been allowed to procure and hold certificates of stock made out in his name and unpaid for, and by which he was enabled to hypothecate the stock to plaintiff, and in this case there was also strong evidence tending to show that the stock had been actually delivered to defendant, who had procured value from plaintiff by hypothecating the same. Speaking to the principles relied upon in this position of appellant in *Lanier v. Clark, supra,* Speers, J., delivering the opinion, said: "But we believe that better reasoning and the weight of authority is otherwise. It is not fair to apply the maxim, 'Where one of two innocent parties must suffer loss by the fraud of a third, he who had made the loss possible by his negligence must bear the burden of loss,' or, 'He who trusts most should suffer most,' for in such case it cannot be said that the maker who delivers a perfect and completed note or bill into the hands of another, trusts more than he who purchases the same from that other on his guaranty of its genuineness. Strictly speaking, the doctrine of estoppel ought not to apply except in those cases where the person making the alteration is in some way clothed with agency, as by an apparent authority to make the change. Any material alteration in an instrument evidencing a pecuniary liability is 'forgery,' and it cannot be said that the maker of a negotiable or nonnegotiable note ought to anticipate that any one would commit a forgery, and, therefore, be required to so execute his instrument that such a forgery would be difficult, if not impossible. The law attaches great importance to that quality of commercial paper known as negotiability, and has gone very far in protecting innocent holders of such paper against all manner of defenses when interposed by the maker; but it should never go to the extent of holding such maker liable upon a contract different from what it appeared to be when it left the maker's hand."

It is further insisted for appellant that though recovery may not be had on the instrument, an action lies for the negligence of defendant in issuing the paper without the use of the devices referred to. This suggestion was met and directly disapproved in *Bank of Albany v. Lester, supra,* and this with the other authorities sustaining defendant's position all proceed upon the principle that where the instrument has been delivered in completed form, the possibility that it might be raised or altered by willful fraud or forgery of another is too remote to afford the basis of an action either in tort or contract. In such case the issuing could

in no sense be considered the proximate cause of the injury. And in this connection it may be noted also that the fact that a recovery according to the original tenor of the instrument against the maker or prior parties is provided for by the statute on the equitable principles of *indebitatus assumpsit,* in itself shows that this is all the recovery contemplated or permitted by the law.

In some of the authorities cited and relied upon by appellant, there were blank spaces capable of being filled with such ease that the cases might be reconciled and recovery sustained by reason of authority implied from the defective condition of the instrument. But I find none that would sustain a recovery in this case, where, as stated, there is no claim or suggestion of agency, but the parties were dealing at arms length in a business transaction and the checks were drawn on the lithographed paper in ordinary use by the bank and its customers, with every space properly filled by writing in ink and the paper delivered in proper form as a completed instrument.

On these facts, if there were no authoritative decisions or statutory regulation in denial of plaintiff's right to recover, the acceptance of its position would be attended with such inconvenience and would introduce such uncertainties in this branch of the Law Merchant that it would be necessary to establish some rule protecting a defendant from liability. These negotiable instruments are among the most important features of our business life. There is no well grounded distinction in principle which imputes liability to a bank in a case of this sort from that which would equally affect an individual. And it would well-nigh withdraw these instruments from ordinary use if any and every one who issued them without these precautionary devices would incur the risk of liability insisted on by plaintiff in this case.

Evidently recognizing this as a drawback of some seriousness, plaintiff seeks to restrict the application of the principle it involves to banks and large business houses, but what would be the size or character of business houses coming under such a rule of liability or how would this matter be determined?

Again, a bank is not supposed to carry a large quantity of these implements on hand, and if their devices go wrong, is their business to be halted till they can have their implements repaired, or until they can procure others? Or if, in the case suggested, they are called on to make a prompt remittance to New York or some large business center, where time is not infrequently of the first importance, can a bank only write its check at the peril of having the check raised by some skillful forger to an amount that means disaster? And what would be the standard of excellence required in the procurement and use of these protective devices?

It is admitted that the kind now in use do not afford complete protection, and it is well known that day by day the agents of these patent devices, enterprising and insistent, offer their wares, claiming that they have the very latest and only efficient protection. Doubtless, a bank should use these things when it has been shown that they lessen the risk of forgery. As a rule they do use them, but that is very far from the position that a failure to use them imports an actionable wrong.

On the record, the Court is of opinion that the essential and pertinent facts alleged in the complaint neither require nor permit an inference of liability, and defendant's demurrer has been properly sustained.

Affirmed.

CLARK, C. J., dissenting: The defendant demurred to the complaint upon the ground that it did not state facts sufficient to constitute a cause of action. The court sustained the demurrer and dismissed the action and this presents the only point in this appeal.

It is well settled law that a demurrer on this ground admits every fact that is pleaded in the complaint. It is therefore admitted:

1. That the plaintiff was a Virginia corporation, engaged in a general banking business at Richmond, Va., and that the defendant is a national banking corporation, engaged in national banking business at Goldsboro, N. C.

2. That a short time prior to 23 June, 1918, after regular banking hours and not in the regular course of business, and when G. A. Norwood, president of the defendant, and one N. L. Massey were alone in defendant's banking house, the defendant, acting through its president and as a matter of accommodation, sold and delivered to said Massey a number of New York exchange checks drawn by defendant upon the First National Bank of New York, and signed by Norwood as president, payable to the order of Massey, and for small amounts, ranging from $2 to $9, among the checks being those sued on in this action. The checks were drawn on ordinary bond paper and not upon what is commonly known as "safety paper," the date, name of payee, and the amount in words and figures being all written in the blanks on the checks with ordinary pen and ink either by Norwood or Massey.

3. It is further admitted by the demurrer that at the time of the issuance of the checks and for some years prior thereto the defendant owned a protectograph or mechanical check writer which it had habitually used in drawing all New York Exchange checks issued by it by means of which the letters forming words denoting the amount of such checks were cut or perforated into the paper, destroying its fiber and damaging its surface by means of which the perforations were dyed with some fast or indelible red and black ink, small perforations forming

BANK *v.* BANK.

some fancy design being made immediately preceding first word and immediately following last word; that in issuing the checks on this occasion Norwood negligently failed and omitted to either write the same upon "safety paper" or to use a protectograph or any like machine or device to write in the amount thereof.

4. It is further admitted by the demurrer that at the time of the issuance of the check, and for years prior thereto, it was a matter of common and general knowledge, which was known by defendant's officers, that there had been discovered and developed certain simple chemical preparations which were easily obtainable at retail stationers at small cost by the public generally, and were in general use for legitimate purposes, by means of which a person of ordinary skill and learning, such as Massey, could easily remove from an ordinary good grade of bond paper such as these checks were written upon, all traces of writing placed thereon with ordinary pen and ink, leaving no visible sign or trace upon the paper of either the original writing or of the means used for its removal.

5. It is further admitted by the demurrer that for several years prior to 1918, when these checks were issued, the danger of innocent parties being damaged and defrauded by application of the processes described above became a matter of general and common knowledge and grave concern to all bankers; and in order to combat the danger to innocent parties, certain simple and protective processes were evolved and adopted and were in use in June, 1918, and had been for some years prior, and their use was generally known and in common use by banking institutions and business houses; and by the use of said processes and devices checks could be so drawn that they could not be altered or raised so as to escape detection by a reasonable and prudent person in the ordinary course of business, save by a few especially and highly trained chemists and documental experts.

6. It is further admitted by said demurrer that these checks could not have been raised by Massey, or any person of ordinary skill and knowledge, if such protective devices had been used, as the defendant was in the habit of using, and as were in common and general use among all banking houses, these devices being, to wit: (*a*) The drawing of checks upon a specially prepared and sensitized paper, known as "safety paper," upon which it was impossible to alter or erase writing without leaving tell-tale traces; and (*b*) a mechanical check-writing machine, such as the kind above described and referred to, and such as was then owned and had been commonly used by this defendant.

7. It is further admitted by the demurrer that the checks so sold by the defendant as aforesaid, out of office hours, and without the use of such devices, were four checks, numbered 11,809, 11,827, 11,811, and

11,829, which were originally drawn for the following amounts, respectively, viz.: $2, $6, $2, and $3; and that after obtaining these checks from the defendant, issued in the manner aforesaid without the protection of above devices, which the defendant possessed and commonly used, and out of office hours, Massey, or some one under his direction, removed therefrom the original writing, denoting the amounts thereof, by means of the chemical process above referred to and raised the same to the following amounts respectively: $9,018.12, $14,084.70, $9,000, and $12,903, the new amounts being inserted in said checks in figures in pen and ink following the dollar mark and being punched and written thereon in words and figures with a mechanical check writer or protectograph of the kind described above, and after having been so altered, when they were presented to the plaintiff the checks appeared regular and genuine in all respects, and bore no visible signs and traces of alteration, and the fact that they had been altered could not be detected by the exercise of ordinary care.

8. On or about 23 June, 1918, Massey, who was known to plaintiff's officers, deposited with the plaintiff at Richmond, Va., the check above referred to, bearing the number 11,829, the same having been altered in the manner above described so as to purport to have been originally drawn for the sum of $12,903, and plaintiff immediately forwarded this check to New York for collection through its correspondent there, and same was duly honored by the First National Bank, the drawee, of which fact plaintiff was informed on 24 June, 1918, and thereupon credited Massey's account with the amount thereof, which, with other funds to his credit, gave Massey a balance of $15,000 on plaintiff's books.

9. It is further admitted by the demurrer that on 24 June Massey drew against plaintiff a check to his own order for $9,000 and used said check in paying another check of like amount which he had hitherto drawn upon the Bank of Commerce and Trust of Richmond, Va., to the order of the defendant, and which had been forwarded for collection, and payment of which had been refused by the drawee by reason of insufficient funds to the credit of Massey; and on the same date the Federal Reserve Bank of Richmond presented to plaintiff for certification, and plaintiff duly certified, a check drawn by Massey for $6,000 to the order of G. A. Norwood (defendant's president), and which was indorsed by said Norwood and said defendant, which check was drawn upon plaintiff and had been previously dishonored on account of insufficient funds. Both of said checks so drawn by Massey were honored and paid by plaintiff prior to its discovery that the $12,903 check was a forgery, and the defendant and its president received the $15,000 above mentioned.

10. It is further admitted by the demurrer that the following day, that is, 25 June, Massey presented to plaintiff for negotiation the three

checks, Nos. 11,809, 11,811, and 11,827, which had been altered as aforesaid, and then appeared and purported to have been drawn respectively for the following amounts: $9,018.12, $14,084.70, and $9,000, and bearing absolutely no traces or evidences of having been altered.

11. The demurrer further admits that plaintiff, having reason to believe in the genuineness of said checks, the other check having been honored by the New York drawee of the defendant, gave Massey the following sums therefor: two New York Exchange checks, $14,084.70 and $7,253.45 respectively (which were negotiated and paid prior to the discovery of the fraudulent raising of said three checks); $7,000 being paid to him in currency and the sum of $3,764.67 by way of credit on notes of Massey held by plaintiff.

12. The demurrer further admits that said three checks were by plaintiff forwarded for collection and dishonored there on account of insufficient funds, and on 28 June it was discovered that they had been fraudulently raised and altered.

13. It is further admitted by the demurrer that on account of the foregoing, plaintiff's net loss and damages were $40,118.17, plaintiff having been called upon as an unqualified indorser to refund, and having refunded, the sum advanced by the New York bank on the first check with interest which it was legally bound to do.

14. It is further admitted by the demurrer that New York Exchange checks drawn by a national bank, written upon "safety paper" or by means of a mechanical check writer, have always enjoyed a very high degree of negotiability, and have always been accepted and cashed by all bankers, not by virtue of any dependence upon the solvency and responsibility of the payee, but merely upon identification of the payee, and with dependence upon the solvency of the drawer and the drawee bank.

15. It is further admitted by the demurrer that the plaintiff knew and relied upon this defendant's habitual and customary use of said protectograph and regular check writer in drawing its New York Exchange checks.

16. It is further admitted by the demurrer that the defendant was negligent in issuing the said checks in the form and under the circumstances alleged, and without using either "safety paper" or the mechanical check writer, and particularly in the failure to use the check writer, which the defendant had habitually and customarily used theretofore; and plaintiff avers that by reason of the above negligent conduct and admissions the defendant is estopped to deny its liability to the plaintiff on account of said checks.

The demurrer having admitted all the above facts, clearly and consecutively stated, the only point involved in this appeal is: "Does the complaint set forth facts sufficient to constitute a cause of action?"

The fundamental legal proposition relied upon by the complainant is that the maker of a negotiable instrument owes a duty to future holders of the same, without notice of any defect therein, and purchased for a valuable consideration, to exercise ordinary care to so draw the instrument as to prevent its being materially altered in a manner not to be detected in the exercise of ordinary care.

This action is based upon the allegations, admitted by the demurrer, of gross negligence on the part of the defendant bank, which negligence was the proximate cause of the imposition practiced by the drawee upon the plaintiff. When, as in this case, such negligence, as is alleged in this complaint, is admitted by the demurrer, and is sustained by the court, as was done in this case, upon the ground that the complaint does not state a cause of action, the dismissal of the action denies to the plaintiff in all such cases the elementary justice of having the rights of plaintiff determined in a court as in all similar cases where a complaining party seeks remedy for damages proximately caused by the negligence of the defendant.

This case is in no wise affected by the provisions of C. S., 3106, which provides: "Where a negotiable instrument is materially altered without the assent of all parties liable thereon, it is avoided except as against the party who has himself made, authorized, or assented to the alteration and subsequent indorsers. But where an instrument has been materially altered, and is in the hands of a holder in due course not a party to the alteration, he may enforce payment thereof according to the original tenor." And the defendant contends that the sum total that it is indebted to the plaintiff for the $40,118.17, which it has paid out by reason, as the demurrer admits, of the proximate negligence of the defendant, is the sum of $2, $6, $2, and $3, to wit: $13.

But C. S., 3106, has no reference whatever to a case like this in which the alteration in the New York Exchange checks issued by the defendant to Massey deceived the plaintiff by reason of the negligence of the defendant, as is alleged in the complaint and admitted in the demurrer, in not using the ordinary and customary methods by which the defendant admits it had heretofore used in issuing said exchange, whereby said Massey was enabled to practice such deception and to make such alterations without detection by the plaintiff.

The cause of action here alleged is the negligence of the defendant, and that this was the proximate cause of the injury sustained by the plaintiff which took this paper in ordinary course relying upon the observance by the drawee bank of the ordinary precautions which said defendant had heretofore observed, as it is alleged and admitted, both by itself and by all other banks, and the failure to do which was the sole cause of the successful deception practiced upon the plaintiff.

BANK *v.* BANK.

It is not a matter of the negotiable instrument law, but whether the defendant bank was guilty of negligence which was the proximate cause of the injury sustained by the plaintiff.

"It is the duty of the maker of the note to guard not only himself, but the public against frauds and alterations, by refusing to sign negotiable paper made in such form as to admit of fraudulent practices upon them with ease and without ready detection." *Zimmerman v. Rote,* 75 Pa. St., 191.

In *Leach v. Nichols,* 55 Ill.; 276, the Court said: "It has been held by this Court that if a man carelessly lets his note go into circulation written in ink and partly in pencil, thus affording both a temptation and an opportunity to fraudulently alter it, and it is so altered, he shall not be permitted to set up such alteration against an innocent holder."

In *Hoffman v. Bank,* 99 Va., 485, it is said: "When a party puts his paper in circulation, he invites the public to receive it of any one having it in possession with apparent title, and he is estopped to urge an actual defect in that which, through his act, ostensibly has none. It is the duty of the maker of a negotiable note to guard not only himself, but the public against frauds and alterations, by refusing to sign negotiable paper made on such a form as to admit fraudulent practices upon them with ease, and without ready detection. The inspection of the paper itself furnishes the only criterion by which a stranger to whom it is offered can test its character, and when the inspection reveals nothing to arouse the suspicions of a prudent man, he will not be permitted to suffer when there has been an actual alteration. Daniel on Negotiable Instruments, sec. 1405."

In *Bank v. MacMillan* (1918), I. A. C. (L. R.), 777, where a check was filled out for a certain amount, and additional words and figures were added to increase the amount, and where the check was a fully completed instrument when it was issued, *Lord Finley* said (p. 811): "If a customer, drawing a check, neglects reasonable precautions against forgery, and if forgery ensues, he is liable to make good the loss to the banker, and the fact that a crime has to intervene to cause the loss does not make it too remote. Indeed, forgery is the very thing against which the customer is bound to take reasonable precaution. Leaving blank spaces in the check is the commonest form in which forgery is facilitated, and to lay down as a matter of law that it is not a breach of duty would be a somewhat startling conclusion." He also says: "No one can be certain of preventing forgery, but it is a very simple thing in drawing a check to take reasonable and ordinary precautions against forgery. If owing to the neglect of such precautions, it is put into the power of any dishonest person to increase the amount by forgery, the customer must bear the loss as between himself and the banker."

There are numerous decisions to the same effect, and in all the courts, and it would be useless duplication to repeat them.

This defendant issued these cashier's checks without using the protectograph and a form of paper used always now-a-days by banks and other large business institutions, as a protection which the defendant knew, or should have known, that all persons would expect to be used as a protection, and the absence of which would furnish occasion to defeat the very negotiability which is the first feature of paper. This is all admitted by the demurrer.

The plaintiff does not contend that this requirement of anticipation or prevention of forgery by alteration, with or without erasure, is required of others than first-class business men or banking institutions dealing largely in such paper, nor even upon them in issuing ordinary notes, checks, and bills, but only when they issue such paper as national bank notes, travelers' checks, or New York Exchange (as in this case), and the measure of care which is asked is simply such care as is commonly used in the doing of these acts by men engaged therein throughout this State and Nation.

Before the volume of exchange reached its present limit, and before the issuance of such paper and its protection by all reasonable devices became essential to security of business, there were decisions of the courts which did not require the use of these devices. But business methods have changed with the increased volume of business, with the multiplication of methods to falsify and forge such papers, and with the ready means of protection now at hand by the use of the protectograph and special paper such as the defendant itself was in the habit of using. The failure to do this on this occasion is alleged to be the proximate cause of the forgery in this case, and that it is directly traceable to this negligence of the defendant. The demurrer should have been overruled and the facts determined on answer filed.

The defendant, if it desires, should have leave to file an answer and raise an issue of fact as to whether there was negligence on the part of the defendant which was the proximate cause, as a matter of fact. The court could not hold as a matter of law on the demurrer that upon the facts alleged in the complaint, and admitted by the demurrer, the defendant was not negligent.

We think the court below erred in sustaining the demurrer, and that the complaint alleged a sufficient cause of action because:

(1) The defendant was in duty bound to exercise ordinary care, by using methods in general use, to so draw its cashier's checks as to prevent their being materially altered with ease in a manner not to be detected by the exercise of ordinary care.

(2) That it was negligence in that the defendant did not use either the "safety paper" or the mechanical check writer, which the demurrer admitted is used ordinarily by all banks, and which the demurrer admits that the defendant had habitually used, and that, relying upon that fact, the plaintiff had been led to, and did reasonably, rely upon the defendant doing so.

(3) Such negligence, upon the allegations in the complaint, which are admitted by the demurrer, was the proximate cause of the plaintiff's injury and loss.

(4) The plaintiff's refund to the drawee bank of the check actually paid was not a waiver or estoppel to prosecute its claim against the defendant since the plaintiff as an unqualified indorser was legally bound to make good such payment by the drawee bank.

(5) The plaintiff was subrogated to the right of the drawee bank against the defendant, and the money having been paid out by the drawee bank upon a mistake of fact could be recovered by the drawee bank against the plaintiff and the defendant is liable to make good the loss to the plaintiff for its negligence in drawing the $12,903 check, irrespective of its liability for its negligence in drawing the other checks, and is liable to repay to the plaintiff the sum of $15,000 received by the defendant under a mistake of facts, for it is estopped by its negligent conduct in inducing a belief on the part of the plaintiff of a state of facts which prevented it ascertaining the lack of genuineness of the $12,903 check.

This Court and all others have sustained the proposition in equity and good morals that whenever one of two innocent parties must suffer for the acts of the third, the one whose conduct has enabled such third person to occasion the loss must sustain it. Or to state it somewhat differently, as more applicable to this case: "Where one of two persons must suffer from the fraud or misconduct of a third person, he who by his negligent conduct made it possible for the loss to occur must bear the loss."

The allegations in the complaint admitted by the demurrer fully charge, if taken to be true, that the proximate cause of the loss sustained by the plaintiff was the negligence of the defendant in failing to take the proper precautions used by all banks and large business houses in this day by the use of properly prepared paper and mechanical check writers to prevent the successful perpetration of the fraudulent alteration of the cashier's checks issued by the defendant bank which precautions the complaint avers, and the demurrer admits, were not only in ordinary use by all banks, but were in regular use by the defendant bank itself. If the failure to do this was the proximate cause of the payment by the

plaintiff, or its correspondent bank, of the cashier's checks issued by the defendant, and which had been fraudulently altered and raised by the aforesaid negligence of the defendant bank, then the latter was liable as a matter of law.

The judgment sustaining the demurrer should be overruled, and the defendant should have leave to file an answer raising the issue of fact as to proximate cause to be passed upon by the jury.   C. S., 546.